UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BLUFFORD HAYES, Jr.,

Petitioner,

v.

ROBERT NEUSCHMID,

Respondent.

No.  2:19-cv-1279 TLN EFB P

FINDINGS AND RECOMMENDATIONS

Petitioner is a California state prisoner who, proceeding with counsel, brings an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  ECF No. 18.  In 1982 and in the San Joaquin superior court, petitioner was convicted of: (1) robbery (Penal Code § 211); (2) burglary (§ 459); and (3) first degree murder with the special circumstance that the murder was committed during a burglary and with a deadly weapon (knife) (§§ 187, 190.2, subd. (a)(17), 459, 12022, subd. (b)).  He was sentenced to death.  In 1990 the California Supreme Court found instructional error and reversed the robbery conviction and the robbery-murder special circumstance.  *See People v. Hayes*, 52 Cal. 3d 577, 597 (Cal. 1990).  It otherwise affirmed, however, including the imposition of the death penalty.  *Id.*

Petitioner filed a federal habeas petition and, in 2005, the Ninth Circuit determined that petitioner's due process rights were violated by the prosecutor's knowing presentation of false evidence.  *Hayes v. Brown*, 399 F.3d 972, 974 (9th Cir. 2005).  Specifically, the Ninth Circuit

1

faulted the prosecution for concealing an agreement it had reached with witness Andrew James.

To wit:

> The prosecution flew James, who had left California, back from Florida for the trial, with the promise that he could return to Florida after testifying. James had a criminal history, having been convicted of petty theft, grand theft, and receiving stolen property. At the time he testified, he also had pending in California three charges of felony theft with a prior conviction, and a charge of being under the influence of heroin. Before trial, the prosecutor had reached an agreement with James's attorney to grant transactional immunity for the Patel killing and to dismiss the other pending unrelated felony charges against James. However, the State wished to keep the promise to dismiss the felony charges away from the trial judge and jury. Therefore, the prosecutor extracted a promise from James's attorney that he would not tell James about the deal. The idea was that James would be able to testify that there was no deal in place, without perjuring himself, because James would not personally be informed of the arrangement.

*Id.* at 976-77.  The Ninth Circuit remanded with instructions to grant the petition.  *Id.* at 988.

The case was re-tried and the jury again found petitioner guilty of: (1) first degree murder; (2) burglary; (3) the special circumstance that the murder was committed during the burglary; and (4) that petitioner used a knife (deadly weapon).  Petitioner was sentenced to 25 years to life plus one year.  A determinate seven-year sentence for the burglary was imposed and stayed.[1]

Petitioner now argues that his rights were violated during his re-trial (and subsequent appellate proceedings).  He raises eights separate claims in the immediate petition, though some contain multiple sub-claims. They are as follows:

First, he alleges that his rights under the Fifth and Sixth Amendments were violated when: (1) he was denied representation by the counsel of his choice; (2) he was denied representation by any conflict free counsel; and (3) he was denied representation by any counsel whatsoever.  ECF No. 18 at 3.

Second, he alleges that his appellate counsel rendered ineffective assistance by: (1) failing to perfect the record on appeal; (2) failing to read the complete record on appeal; (3) declining to accept the assistance of former appellate and trial counsel in identifying and improving arguments

---

[1] The state dropped the death penalty in April of 2013.

1   on appeal; (4) failing to use evidence in the appellate record that would show that the killing was

2   not murder but, at most, manslaughter and that the burglary was conceived and executed by

3   another person; (5) failing to move to expand representation to include authority to file an

4   ancillary petition for habeas corpus; and (6) failing to file such a petition.

5          Third, petitioner claims that the trial court violated his due process and right to counsel

6   when it misconstrued his request for advisory counsel to be a request for appointment of co-

7   counsel (to which he did not have a right).

8          Fourth, petitioner claims that the trial court erred when, after petitioner absented himself

9   from the trial, it declined to either declare a mistrial or appoint conflict-free counsel.

10          Fifth, petitioner claims the trial court erred when it failed to obtain a proper waiver for his

11   absence.

12          Sixth, petitioner claims that his rights to confront and cross-examine witnesses were

13   violated when: (1) the trial court instructed the jury not to consider the reasons for the lengthy

14   delay in the trial; and (2) at the retrial, a prosecution witness relayed statements made to her by a

15   dead man whose credibility petitioner could not examine or impeach.

16          Seventh, petitioner argues the trial court violated his due process rights when it failed to

17   instruct the jury that, as to felony murder, the intent to commit the felony must be formed before

18   or at the time of the killing.  He also contends that the trial court failed to instruct the jury as to

19   his right not to testify.

20          Finally, petitioner alleges that his rights to due process and to examine witnesses were

21   violated when the prosecution introduced hearsay statements in violation of California law.

22          For the reasons stated hereafter, the court recommends the petition be denied.

23                                    FACTUAL BACKGROUND

24          The court has reviewed the state appellate court's summation of the facts.  Having

25   determined that it is consistent with the record, it is reproduced here (and in part) to offer context:

26          On January 1, 1980, defendant robbed and repeatedly and fatally
              stabbed Vinod "Pete" Patel. Defendant committed a similar robbery
27            of James Cross a few days later. He then fled to Oregon, and later
              lied to the police about both incidents. A jury found him guilty of
28            robbery, burglary, and murder, and found true special circumstances

of murder during the commission of robbery and burglary, and an allegation that defendant used a knife.

. . .

Patel lived in a residence connected to the [Rice Motel in Stockton]'s office, and kept at most $200 in a file cabinet, in which he also kept cartons of cigarettes to sell to residents. Mukesh Patel, a relative, worked at the motel for a few days in December 1979 during a college break. He testified that when Patel left the office, he would take a key ring with a master key and an office key otherwise kept on a hook in the office. The managerial living quarters were kept locked, while the door to the manager's office area was kept unlocked.

On December 27, 1979, Patel called the police to report defendant for trespassing. An officer saw signs that defendant had forced his way into room 9. Defendant told the officer he knew his rent was in arrears, but that he planned to have his girlfriend pay it soon. Defendant appeared to be under the influence of narcotics.

In December 1979, defendant's sister, Barbara Lord, lived in room 15. On New Year's Eve--after drinking with friends, defendant, and another brother (Robert Hayes)-- Lord left, leaving defendant in her room. When Lord returned that afternoon, she found Patel dead on her floor.

Bearla Mae (May) Wyatt lived in room 16. Around 9:30 a.m. New Year's Day, she went to the office and saw defendant speaking calmly with Patel about defendant's report of a plumbing problem. Wyatt came back about 15 minutes later and the men were still there. Defendant left, allowing Patel to help Wyatt, and she heard Patel tell defendant he would handle the plumbing issue after he helped Wyatt. She later saw Patel go into room 15. Later, she saw defendant cross the parking lot toward James's[2] car, wearing a jacket and pants, but no shirt, carrying a box. James was also carrying something like clothing, but not a box. Defendant got into James's car, and James drove off.

The motel was a U-shaped, two-story structure. Room 15 was about 107 feet from the manager's office.

Michelle Gebert lived in a room with James, her boyfriend. They used heroin, as did defendant. The motel had problems with drugs and prostitution. On New Year's morning, defendant knocked and asked for James; he was nervous and in a hurry and wanted a ride, but was not intoxicated. He was wearing a blue suit with wet spots, but no shirt or vest, which he had worn the night before. James took 10 to 15 minutes to get ready, while defendant kept looking out of the door and telling him to hurry. Defendant told Gebert he stole from the office. When she asked if he was worried about police, defendant

---

[2] The references to "James" are to Andrew James – the witness referenced in the introduction.

4

said Patel would not say anything to anybody. After the two men left, Gebert saw cartons of cigarettes on the ground.

Gebert and Lord testified Patel was a "good man," a "fair man," and a "fairly nice" man.

Responding officers found Patel's body on its side in room 15, with stab wounds, bound by coat hangers at the wrists and ankles, with blood spatters on the bathroom floor and wall. No signs of a struggle were evident in the bedroom, but the office and Patel's attached living quarters had been ransacked.

In room 15, crime scene investigators found a leather satchel or purse with an empty knife sheath on the bed, a blue vest and a bloody dress shirt. The office desk and cabinet drawers were open or removed, and there were cartons of cigarettes on the floor. In Patel's living quarters, the drawers from the file cabinet were open and there was blood inside the door. There was a fixed-blade hunting knife that fit the sheath found in room 15, and cigarette cartons scattered around. Patel's keys were on the floor of his living room. The knife was in Patel's bedroom, not in the room where his keys were found.

Lord told officers that defendant carried a leather shoulder pouch and she last saw him wearing all three pieces of his blue suit, and a shirt.

A crime scene reconstructionist was of the opinion, based on blood spatter and other evidence, that the killing began in the bathroom, where Patel was standing. He was on or near the floor by the time he reached the bedroom.

On January 3, 1980, defendant called the police and asked if they wanted to talk about the motel "murder" and when told they did, defendant said "'I wasn't in that room.'" When told that Lord had said he was in the room, defendant admitted he had been there, but claimed that he left right after Lord left. Defendant said he would be at the stationhouse at 4:00 p.m., but he never arrived.

On January 5, 1980, defendant had an altercation with James Cross at the Flamingo Motel in Stockton. In defendant's room, defendant hit Cross with a pistol, bound his hands and feet with coat hangers, took his money, and fired a shot into the floor. Police found a bullet in the floor, and defendant's fingerprints in the room.

Defendant was arrested in Oregon. On January 23, 1980, Detective Wingo interviewed defendant, who denied being at the Rice Motel the morning of January 1, 1980, and said he had not been at the Flamingo Motel for a year, even when he was told--truthfully--that his fingerprints were found in Cross's room.

A deputy coroner testified blood covered Patel's arm but because there was none under the coat hanger, he was bound before he was stabbed. A pathologist testified Patel had defensive cuts to his arm, wrist, and hand, and a total of 22 wounds, six in the chest inflicted with great force while Patel was immobile. Three of these were into the heart and three into the lungs. Patel bled to death within 15

minutes, probably sooner. Each chest wound was potentially fatal, indicating force, depth, and intent to kill.

Defendant's testimony from the first trial was read to the jury as follows:

Defendant and his sister (Lord) each had motel rooms. He was a heavy user of both heroin and Ritalin, and had not slept for the last three days before the murder. He spent as much as $100 per day for heroin, and Ritalin cost him $6 per pill. He had no job and could not pay the rent. On New Year's Eve, he partied in his sister's room, along with his brother, Wyatt, and others. The next morning, he spoke with Patel about a plumbing problem in his sister's room. Patel told defendant to shut off the water, and that he would fix the problem later. They did not argue. Defendant followed Patel's instructions, then drank wine and fell asleep. He woke up to find Patel slapping him in the face and then "noticed that [Patel] had a knife," which he admitted was from the nearby leather pouch and sheath, but which he denied was his knife. When defendant reached for the knife, Patel cut him, and defendant grabbed Patel, forcing him to drop the knife, which defendant picked up. Patel then reached for a butcher knife on top of a dresser and defendant began stabbing him, while Patel fought back. Defendant bound Patel hand and foot with two coat hangers he had unwound, because he feared Patel would attack him again. Defendant testified he bound Patel so he would not have to hurt him further, yet he never sought any help for Patel. He went to the room used by James and Gebert and told James he had to take Patel down. When James expressed doubt, he told James to look for himself; after James went to do so, defendant eventually went to the manager's office, and found James taking cigarette cartons. At James's request, defendant helped James take cigarettes to James's car. Defendant denied telling Gebert he had "ripped" off the office or Patel, or that Patel would not say anything. Defendant told James he "had to down" Patel and had woken up because Patel was hitting him in the face, and he might have told James that he had had to "off" Patel. James drove defendant to defendant's mother's house, where defendant found he had a chest wound. Defendant went to Oregon several days later to avoid capture. He testified that he told Wingo he had nothing to do with Patel's killing, and denied telling Wingo that Patel attacked him or had a knife. Defendant was about six foot, one inch tall, and Patel was about five foot, six inches tall.

/////

/////

/////

/////

/////

/////

/////

6

The prosecutor gave an argument before the jury instructions were read, but defendant chose not to argue. The prosecutor argued Patel was a nice man and there was no reason for him to attack defendant--a much larger man--with whom he had a cordial conversation earlier that day. The prosecutor argued neither self-defense, voluntary intoxication, diminished capacity either due to present intoxication or to prolonged drug use, nor heat of passion or sudden quarrel, applied to reduce the crime from murder.[3] Defendant could have fled after he got the knife from Patel. Even after binding Patel's hands and feet, defendant did not call for help. Instead, he went to Gebert's room and sought a ride out of the area. Defendant's detailed testimony refuted any claim of diminished capacity or intoxication; nor did Gebert, a drug user herself, believe defendant was under the influence that morning. Nothing in defendant's testimony established self defense or heat of passion or a sudden quarrel, because although defendant claimed Patel slapped him awake for no reason, defendant continued acting well after Patel was no longer a threat, when any reasonable person would have either left, called the police, or sought help from neighbors.

As for felony murder, the prosecutor argued defendant lured Patel into the bathroom to begin attacking him, then "got the keys, went into the manager's [area] and the place is ransacked. . . . [H]e killed him. Entered the residence intending to steal, that's burglary . . . . [¶] You could conclude that it was robbery as well if you conclude that the taking of the keys was from the immediate person or presence of Mr. Patel which it appears it was." The keys were of specific value, because defendant could use them to reenter the motel anytime, either to sleep, or to steal.

The jury found defendant guilty as charged . . . .

ECF No. 13-27 at 2-10.  The California Court of Appeal affirmed the judgement, *id.* at 60-61, and the California Supreme Court denied the subsequent petition for review, ECF No. 13-28, and state habeas petition, ECF No. 13-29.

STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

I.      Applicable Statutory Provisions

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be

---

[3] [**Footnote 3 in original text**] The diminished capacity defense was abolished by statutes in 1981 and the adoption of Proposition 8, the Victim's Bill of Rights, in 1982. (*See People v. Avena* (1996) 13 Cal.4th 394, 414; *People v. Saille* (1991) 54 Cal.3d 1103, 1111-1112.) But because Patel's killing predated its abolition, and at defendant's request, the jury herein was instructed on the diminished capacity defense.

7

granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Section 2254(d) constitutes a "constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus." *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000). It does not, however, "imply abandonment or abdication of judicial review," or "by definition preclude relief." *Miller El v. Cockrell*, 537 U.S. 322, 340 (2003). If either prong (d)(1) or (d)(2) is satisfied, the federal court may grant relief based on a de novo finding of constitutional error. *See Frantz v. Hazey*, 533 F.3d 724, 736 (9th Cir. 2008) (en banc).

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. *Harrington v. Richter*, 562 U.S. 86, 99-100 (2011). State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state law procedural principles to the contrary. *Id.* at 784-785 (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785.

A.    "Clearly Established Federal Law"

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. *Lockyer v. Andrade*, 538 U.S. 63, 71 72 (2003). Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in issue is clearly established by Supreme Court precedent." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

/////

8

B.     "Contrary To" Or "Unreasonable Application Of" Clearly Established
       Federal Law

Section 2254(d)(1) applies to state court adjudications based on purely legal rulings and mixed questions of law and fact. *Davis v. Woodford*, 384 F.3d 628, 637 (9th Cir. 2003). The two clauses of § 2254(d)(1) create two distinct exceptions to AEDPA's limitation on relief. *Williams*, 529 U.S. at 404-05 (the "contrary to" and "unreasonable application" clauses of (d)(1) must be given independent effect, and create two categories of cases in which habeas relief remains available).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." *Id.* at 405. This includes use of the wrong legal rule or analytical framework. "The addition, deletion, or alteration of a factor in a test established by the Supreme Court also constitutes a failure to apply controlling Supreme Court law under the 'contrary to' clause of the AEDPA." *Benn v. Lambert*, 283 F.3d 1040, 1051 n.5 (9th Cir. 2002). *See, e.g., Williams*, 529 U.S. at 391, 393 95 (Virginia Supreme Court's ineffective assistance of counsel analysis "contrary to" *Strickland*[4] because it added a third prong unauthorized by *Strickland*); *Crittenden v. Ayers*, 624 F.3d 943, 954 (9th Cir. 2010) (California Supreme Court's *Batson*[5] analysis "contrary to" federal law because it set a higher bar for a prima facie case of discrimination than established in *Batson* itself); *Frantz*, 533 F.3d at 734 35 (Arizona court's application of harmless error rule to *Faretta*[6] violation was contrary to U.S. Supreme Court holding that such error is structural). A state court also acts contrary to clearly established federal law when it reaches a different result from a Supreme Court case despite materially indistinguishable facts. *Williams*, 529 U.S. at 406, 412 13; *Ramdass v. Angelone*, 530 U.S. 156, 165-66 (2000) (plurality op'n).

/////

---

[4] *Strickland v. Washington*, 466 U.S. 668 (1984).

[5] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[6] *Faretta v. California*, 422 U.S. 806 (1975).

A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407 08.  It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable.  *Wiggins v. Smith*, 539 U.S. 510, 520 21 (2003).  This does not mean, however, that the § (d)(1) exception is limited to applications of federal law that "reasonable jurists would all agree is unreasonable."  *Williams*, 529 U.S. at 409 (rejecting Fourth Circuit's overly restrictive interpretation of "unreasonable application" clause).  State court decisions can be objectively unreasonable when they interpret Supreme Court precedent too restrictively, when they fail to give appropriate consideration and weight to the full body of available evidence, and when they proceed on the basis of factual error.  *See, e.g., Williams*, 529 U.S. at 397-98; *Wiggins*, 539 U.S. at 526 28 & 534; *Rompilla v. Beard*, 545 U.S. 374, 388 909 (2005); *Porter v. McCollum*, 558 U.S. 30, 42 (2009).

The "unreasonable application" clause permits habeas relief based on the application of a governing principle to a set of facts different from those of the case in which the principle was announced.  *Lockyer*, 538 U.S. at 76.  AEDPA does not require a nearly identical fact pattern before a legal rule must be applied.  *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007).  Even a general standard may be applied in an unreasonable manner.  *Id.*  In such cases, AEDPA deference does not apply to the federal court's adjudication of the claim.  *Id.* at 948.

Review under § 2254(d) is limited to the record that was before the state court.  *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).  The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it.  *Id.*  In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did."  *Id.* at 1399.

Where the state court's adjudication is set forth in a reasoned opinion, § 2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis."  *Frantz*, 533 F.3d at 738 (emphasis in original).  A different rule applies where the state court rejects claims summarily, without a reasoned opinion.  In *Harrington*, *supra*, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must

1    determine what arguments or theories may have supported the state court's decision, and subject

2    those arguments or theories to § 2254(d) scrutiny.  *Harrington*, 562 U.S. at 101-102.

3           C.     "Unreasonable Determination of The Facts"

4           Relief is also available under AEDPA where the state court predicated its adjudication of

5    a claim on an unreasonable factual determination.  Section 2254(d)(2).  The statute explicitly

6    limits this inquiry to the evidence that was before the state court.

7           Even factual determinations that are generally accorded heightened deference, such as

8    credibility findings, are subject to scrutiny for objective reasonableness under § 2254(d)(2).  For

9    example, in *Miller El v. Dretke*, 545 U.S. 231 (2005), the Supreme Court ordered habeas relief

10   where the Texas court had based its denial of a *Batson* claim on a factual finding that the

11   prosecutor's asserted race neutral reasons for striking African American jurors were true.

12   *Miller El*, 545 U.S. at 240.

13          An unreasonable determination of facts exists where, among other circumstances, the

14   state court made its findings according to a flawed process – for example, under an incorrect

15   legal standard, or where necessary findings were not made at all, or where the state court failed to

16   consider and weigh relevant evidence that was properly presented to it.  *See Taylor v. Maddox*,

17   366 F.3d 992, 999 1001 (9th Cir.), cert. denied, 543 U.S. 1038 (2004).  Moreover, if "a state

18   court makes evidentiary findings without holding a hearing and giving petitioner an opportunity

19   to present evidence, such findings clearly result in a 'unreasonable determination' of the facts"

20   within the meaning of § 2254(d)(2).  *Id.* at 1001; accord *Nunes v. Mueller*, 350 F.3d 1045, 1055

21   (9th Cir. 2003) (state court's factual findings must be deemed unreasonable under section

22   2254(d)(2) because "state court . . . refused Nunes an evidentiary hearing" and findings

23   consequently "were made without . . . a hearing"), *cert. denied*, 543 U.S. 1038 (2004); *Killian v.*

24   *Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) ("state courts could not have made a proper

25   determination" of facts because state courts "refused Killian an evidentiary hearing on the

26   matter"), *cert. denied*, 537 U.S. 1179 (2003).

27          A state court factual conclusion can also be substantively unreasonable where it is not

28   fairly supported by the evidence presented in the state proceeding.  *See, e.g., Wiggins*, 539 U.S.

11

at 528 (state court's "clear factual error" regarding contents of social service records constitutes unreasonable determination of fact); *Green v. LaMarque*, 532 F.3d 1028 (9th Cir. 2008) (state court's finding that the prosecutor's strike was not racially motivated was unreasonable in light of the record before that court); *Bradley v. Duncan*, 315 F.3d 1091, 1096 98 (9th Cir. 2002) (state court unreasonably found that evidence of police entrapment was insufficient to require an entrapment instruction), *cert. denied*, 540 U.S. 963 (2003).

II.   The Relationship Of § 2254(d) To Final Merits Adjudication

To prevail in federal habeas proceedings, a petitioner must establish the applicability of one of the § 2254(d) exceptions and also must also affirmatively establish the constitutional invalidity of his custody under pre AEDPA standards. *Frantz v. Hazey*, 533 F.3d 724 (9th Cir. 2008) (en banc). There is no single prescribed order in which these two inquiries must be conducted. *Id.* at 736 37. The AEDPA does not require the federal habeas court to adopt any one methodology. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

In many cases, § 2254(d) analysis and direct merits evaluation will substantially overlap. Accordingly, "[a] holding on habeas review that a state court error meets the 2254(d) standard will often simultaneously constitute a holding that the [substantive standard for habeas relief] is satisfied as well, so no second inquiry will be necessary." *Frantz*, 533 F.3d at 736. In such cases, relief may be granted without further proceedings. *See, e.g., Goldyn v. Hayes*, 444 F.3d 1062, 1070 71 (9th Cir. 2006) (finding § 2254(d)(1) unreasonableness in the state court's conclusion that the state had proved all elements of the crime, and granting petition); *Lewis v. Lewis*, 321 F.3d 824, 835 (9th Cir. 2003) (finding § 2254(d)(1) unreasonableness in the state court's failure to conduct a constitutionally sufficient inquiry into a defendant's jury selection challenge, and granting petition); *Williams v. Ryan*, 623 F.3d 1258 (9th Cir. 2010) (finding § 2254(d)(1) unreasonableness in the state court's refusal to consider drug addiction as a mitigating factor at capital sentencing, and granting penalty phase relief).

In other cases, a petitioner's entitlement to relief will turn on legal or factual questions beyond the scope of the § 2254(d) analysis. In such cases, the substantive claim(s) must be separately evaluated under a de novo standard. *Frantz*, 533 F.3d at 737. If the facts are in dispute

12

1   or the existence of constitutional error depends on facts outside the existing record, an evidentiary

2   hearing may be necessary.  *Id.* at 745; *see also Earp*, 431 F.3d 1158 (remanding for evidentiary

3   hearing after finding § 2254(d) satisfied).

4                                                    DISCUSSION

5        I.      Errors in Appointment of Counsel

6              Petitioner, as noted *supra*, raises claims related to appointment of trial counsel.  First, he

7   alleges that the trial court erred in failing to appoint a particular attorney – Richard Such – as his

8   trial counsel.  Second, the trial court erred when it declined to appoint conflict-free counsel.

9   Third, the trial court erred when it allowed petitioner to absent himself from the trial without

10  acquiring a proper waiver.  Fourth, he alleges that the trial court erred when it misconstrued his

11  request for advisory counsel and interpreted it as a request for co-counsel.

12            A.      State Court Decision

13             The state court of appeal rejected these claims on direct review.  The appellate court

14  addressed the claims together and offered a "general background" of petitioner's issues with

15  counsel.  Though lengthy, the court finds it contextually appropriate to reproduce all parts of the

16  decision here:

17                  Counsel Richard Such represented defendant on his first appeal, but
                    was removed from representing him on retrial based on a trial court
18                  finding (per Hastings, J.) that he lacked competence to handle a death
                    penalty trial. Such continued to participate in various ways despite
19                  court orders not to do so, and ultimately was permitted to act as
                    defendant's retained (pro bono) counsel for purposes of a new trial
20                  motion and sentencing. Defendant claims Such's removal as
                    defendant's counsel was erroneous for various reasons, as were the
21                  various trial courts' repeated refusals to reinstate him.

22                  A. *General Background*

23                  Such represented defendant for many years in his appeal in *Hayes I*,
                    and, with other counsel, represented him in the federal proceedings
24                  leading to *Hayes II*. On remand, over time, a number of attorneys
                    were appointed for defendant and then relieved for various reasons.
25

26  /////

27  /////

28  /////

                                                         13

In June 2005, Such was appointed as second counsel in what was then still a death penalty case. (*See Keenan v. Superior Court* (1982) 31 Cal.3d 424, 434 [a capital defendant may be entitled to a second appointed counsel] (*Keenan*).) In September 2005, he was appointed as lead counsel although he did not meet required qualifications, based on discretionary findings by the trial court (Hastings, J.), including that Such had a unique relationship to the case and that defendant reposed special confidence in him. (*See Harris v. Superior Court* (1977) 19 Cal.3d 786, 795-799 [although an indigent defendant cannot select appointed counsel, a trial court must consider whether a defendant's preferred attorney has an existing relationship of confidence and trust with the defendant, or a special understanding of the case, or both] (*Harris*).)

In 2006, Such filed an unsuccessful motion for co-counsel, and then filed a motion for a continuance, in part citing his medical condition as making it impossible to go to trial without co-counsel. By writ of mandate, we directed the trial court to reconsider the application for the reasons described in the sealed portion of the petition; our remittitur issued in January 2008.

In December 2007, attorney William Locke moved to be appointed as counsel, citing his extensive criminal jury trial experience, including as lead counsel in four cases that began as capital cases. On December 10, 2007, Judge Hastings held a hearing described in the minutes as one "to show cause why [Such] should either be removed as [counsel] of record or in the alternative whether or not he should remain as the appointed counsel of record as the solo counsel or whether he should remain as lead counsel & Keenan counsel should be appointed." At the hearing, Judge Hastings stated that Such did not "come close" to meeting the qualifications for appointment, even apart from his medical issues.

Following our remittitur, Judge Hastings found Such was unable to continue as lead counsel, in part based on Such's admission that he was "unqualified and incompetent to defend a capital defendant in a jury trial; his repeated demonstration he is unqualified based upon unreasonable and unnecessary investigation plans and unreasonable proposed trial tactics; his personal issues with an overburdened appellate case load and his medical condition which might become aggravated because of the stress associated with a capital jury trial and possibly necessitate trial delays or even a mistrial. [¶] On numerous occasions in support of his request for second counsel, Mr. Such has admitted he lacks the qualifications and experience needed to prepare a capital case for jury trial. Other than reviewing the work of trial attorneys in two death penalty appeals and preparing legal arguments on appeal, he . . . has no experience in actually preparing a presenting a penalty phase defense to a jury. [¶] With the exception of a competency jury trial, Mr. Such has not tried a criminal jury trial for over twenty years. His practice is limited to a criminal appellate specialization. By his own admission, he is not qualified and no experience in examining . . . forensic expert witnesses."

Judge Hastings also explained in some detail what he viewed as irrational tactical routes Such was exploring. For example, Such

14

planned to argue defendant used wire to defend himself from an intoxicated Cross, despite the fact that defendant had been convicted "by plea of robbery and assault with a deadly weapon with an admission of enhancements of personal use of a firearm and infliction of great bodily injury in the Cross incident." Further, in *Hayes I*, Such had alleged counsel at the first trial was incompetent for not attacking Cross on the basis of intoxication, and our Supreme Court held th[is] was "pure speculation " and "to suggest Mr. Cross provoked defendant would not only be implausible but would also serve to antagonize the jury." Similarly, Such wanted to relitigate defendant's guilt on escape and related charges (assaulting a correctional officer and possessing a shank), even though defendant had pleaded guilty, thus conclusively admitting guilt. Finally, "the court has considered the brief medical opinions and concludes that Mr. Such is not medically fit to withstand the stress associated with a capital jury trial *either alone or with a second counsel*." (Italics added.)

Accordingly, Such was discharged, and the trial court reset the next hearing far enough out for Such to pursue appellate relief from the removal order. (*See People v. Noriega* (2010) 48 Cal.4th 517, 525, fn. 1.) However, Such did not seek any such relief, and we note that defendant's motion for a new trial based on this discharge order was denied both on the merits and because defendant had had the opportunity to challenge the order but did not do so.

After several attorneys had been appointed to represent him, defendant ultimately exercised his right to self-representation on October 14, 2008.

In June 2009, defendant filed a motion to reappoint Such as *Harris* counsel, but stated he did not want give up his right to self-representation if the motion were denied. In a handwritten portion, defendant suggested that Such could be appointed as advisory counsel. Judge John T. Ball denied the motion in July 2009, and defendant did not challenge that ruling.

The People dropped the death penalty in April 2013. At a May 2013 trial setting conference, after Judge Lacy took over the case and appointed a defense investigator, defendant confirmed he did not want counsel. But in June 2013, defendant moved to reinstate Such as counsel. Defendant emphasized he was not making a general request for counsel, he only wanted Such or to remain self-represented. The motion, inter alia, alleged pervasive conflicts of interest in the local criminal lawyer referral service making it impossible to provide "unbiased" counsel, purported to challenge Judge Hastings's 2008 order, and made allegations of impropriety about the District Attorney's office and various judges appointed to hear the case.

Judge Lacy reviewed a 2011 letter defendant wrote to Judge Ball, and the transcript of the hearing held before Judge Ball in April 2011. Defendant made allegations against Such described in the new trial ruling as such that "there never could be a Harris relationship again from which Mr. Such should be appointed." Defendant had explained

15

that he wanted a court order to stop Such from continuing to "interfere"-- defendant's word--with the case. After Judge Ball read a sealed letter defendant wrote, he stated he was surprised at the claims of misconduct against Such. Judge Ball later ruled Such was "permanently disqualified from representing [defendant] in these proceedings.[7]

Judge Lacy denied the June 2013 motion to "reinstate" Such but agreed to consider defendant's motion to appoint new counsel, with Such as a possible candidate. In July 2013, Judge Lacy reiterated that he would not reinstate Such, and then set forth reasons for not appointing Such as counsel, including the reasons given by Judge Hastings in his ruling removing Such in 2008, and defendant's claim to Judge Ball in 2011 that Such was interfering with the case. Judge Lacy also referenced a document defendant filed in August 2011, seeking a "cease and desist" order against Such, which attached exhibits containing defendant's complaints about Such that were "so strong, impassioned and detailed" that Judge Lacy doubted Such could have survived a *Marsden* motion (see *People v. Marsden* (1970) 2 Cal.3d 118), had one had been made. Judge Ball had indeed issued a cease and desist order in September 2011. He discussed reporting Such to the State Bar after learning Such was continuing to act in the case, which he found "surprising, shocking, and totally inappropriate." Defendant requested a cease and desist order against Such, but did not want him reported to the State Bar, and Judge Ball acquiesced. Judge Lacy denied the motion to appoint Such. Defendant refused an offer of other counsel, including "advisory and or stand-by counsel" and continued to be self-represented.

In October 2013, Judge Lacy stated defendant "has chosen to represent himself after many offers by the court to appoint an attorney to represent him, as his attorney, as advisory counsel, as standby counsel. The court denied his request to have Mr. Such reinstated. Mr. Hayes stated he wishes to represent himself." An October 24, 2013 minute order suggests Judge Lacy again offered defendant a particular attorney "in some capacity," but defendant refused. Judge Lacy's new trial ruling in part found, "Had any error been made in 2009 in refusing to appoint advisory counsel, that error was cured by the Court's offers in 2013."

B. *Claims and Analysis*

We make a preliminary observation before addressing defendant's claims. In some instances judges ruling on later motions in this case examined or referenced earlier rulings by other judges. Although one trial judge cannot overrule the prior decision of another trial judge

---

[7] [**Footnote eleven in original text**] An April 6, 2011, letter in the record from defendant to Judge Ball accuses Such of having an "emotional attachment and unhealthy obsession" with the case, in which he "has refused to help unless [it is] related to his re-appointment as counsel or his personal interest." Defendant's purpose in writing was "to inform the court of Mr. Such's [efforts] to exploit and manipulate everyone, including the court, and to ask the court for sufficient time to overcome and dispel Mr. Such's delusion and to prepare the only viable defense that is available."

(*see In re Alberto* (2002) 102 Cal.App.4th 421, 427-428), here the successive motions for Such's reinstatement were new motions based on further facts and procedural events. The later judges could consider the facts found and reasons given by prior judges, to provide context for each motion as it arose, for example, to determine if

any alleged changed facts were material to the motion then under consideration. To do otherwise would encourage forum shopping. (*See People v. Superior Court* (*Scofield*) (1967) 249 Cal.App.2d 727, 734.) In our view, the later judges properly considered the facts and reasoning of prior rulings in determining issues before them.

### 1. *The scope of our remittitur*

Defendant contends Judge Hastings's 2008 order removing Such "was in disobedience to the remittitur, and was thus void." But our January 2008 remittitur did not compel Judge Hastings to grant defendant's request for second counsel. We ordered him to "*reconsider* counsel's application for the appointment of a second attorney for the reason described in the [sealed] petition for writ of mandate." (Italics added.) An order to reconsider is not an order to exercise discretion one way or the other. Once Judge Hastings reconsidered, he found it would be inappropriate to keep Such on "either alone or with a second counsel." Because our remittitur merely required Judge Hastings to reconsider his previous order, we reject defendant's claim that Judge Hastings exceeded the scope of our remittitur, which was not so limited as to preclude consideration of the propriety of maintaining Such as defendant's attorney in any capacity.

### 2. *The ruling by Judge Hastings in 2008*

Defendant contends Judge Hastings violated his right to continuation of Such as his appointed counsel in 2008 and separately claims that ruling represented an abuse of discretion. We address these two claims together.

"Counsel may . . . be relieved on the trial court's own motion, over the objection of the defendant or his counsel, 'to eliminate potential conflicts, *ensure adequate representation*, or prevent substantial impairment of court proceedings.' [Citation.] On appeal, a trial court's removal of counsel for an indigent criminal defendant is reviewed for abuse of discretion." (*People v. Cole* (2004) 33 Cal.4th 1158, 1187, italics added; *see People v. Jones* (2004) 33 Cal.4th 234, 240.)

Judge Hastings's written decision, discussed ante, adequately supports the conclusion that Such was not competent to handle a death penalty trial, both based on lack of current trial experience and for medical reasons that could well result in further delays in bringing the case to retrial. Those were valid bases on which to remove him.

It is true, as defendant points out, that our Supreme Court has held that "once counsel is appointed to represent an indigent defendant, whether it be the public defender or a volunteer private attorney, the

17

parties enter into an attorney-client relationship which is no less inviolable than if counsel had been retained." (*Smith v. Superior Court* (1968) 68 Cal.2d 547, 562 (*Smith*).) This case is only superficially like *Smith*.

In *Smith*, for a retrial, the defendant was appointed the same attorney who had succeeded in reversing his prior capital conviction on appeal. (*Smith, supra,* 68 Cal.2d at pp. 549-550.) But as the proceedings leading to a retrial ensued, a judge newly appointed to the case quickly became annoyed at the attorney's courtroom manner, on its own motion questioned the attorney's competence, and then removed him from the case, refusing counsel's request to respond to the accusation, and over the defendant's clear and repeated objections. (*Id.* at pp. 551-553.) Here, Judge Hastings conducted a hearing on the question of counsel and did not act peremptorily, nor deprive the defense of an opportunity to make its views known. This case is not like *Smith*.

Defendant points out that every experienced death penalty attorney starts out with her or his first death penalty case. We agree that "if attorneys were not permitted to try death penalty cases unless they had previously tried one such case, the number of attorneys 'competent' to do so would be fixed, and indeed would steadily diminish through the inevitable process of attrition." (*Smith, supra,* 68 Cal.2d at p. 552, fn. 1.) But this does not mean anyone with a bar card can or should try a capital murder case. Such had not tried *anything* apart from a competency hearing for 20 years. However polished Such's appellate skills may have been, Judge Hastings could rationally conclude it would be folly to allow him to jump into a capital retrial. This is so even given Such's five murder cases in the 1970's, and one trial that began as a capital case in 1982-1984. It also appeared Such was delaying matters, perhaps not intentionally, but because of his medical condition, lack of experience, and so forth. Under these circumstances, we find no abuse of discretion by Judge Hastings in 2008.

### 3. *The ruling by Judge Ball in 2009*

Defendant next contends Judge Ball abused his discretion by denying the 2009 motion to reinstate Such, or to appoint him as advisory counsel.

Defendant's motion by its caption sought reappointment of Such as *Harris* counsel, and emphasized that defendant was not seeking any other lawyer but Such and would otherwise remain self-represented if the motion were denied. The motion generally faulted the handling of counsel by Judge Hastings, and detailed the long and tortuous history of defendant's various attorneys and investigators to that point and the purported reasons they came and went. It argued Such was not incompetent to try the case and emphasized defendant's trust in him and their established relationship. Defendant also presented the declaration of an experienced attorney who had known Such professionally for many years, and was informed that in the 1970's he had tried five murder cases to juries, then worked for a Court of Appeal justice, and then became a criminal appellate attorney.

18

Another attorney described good trial work Such had done in a complex multi-defendant, multiple-murder capital case, although the date of trial was uncertain. Then-counsel-of-record for defendant, public defender Samuel Behar, declared in part that Such was uniquely qualified because of his intimate knowledge of the prosecutorial misconduct condemned in *Hayes II* and purported "pattern of misconduct" by the San Joaquin County District Attorney's office. Undated and unsworn excerpts of a document Such purportedly wrote in connection with a motion to disqualify a judge were attached, in which Such states his medical condition is "completely controlled by medication" but even then qualifies this by continuing: "The only possible problem would be exhaustion. But that problem could be avoided by the appointment of second counsel, and such appointment would solve any problem that might arise, because second counsel would be able to take over temporarily for me." Thus, even in this undated document, Such did not dispute he had some medical condition that he anticipated might result in his incapacity, given the rigors of a murder trial.

On June 25, 2009, Judge Ball continued the case, cautioning defendant to consider how he wanted to proceed, and suggesting he accept a qualified attorney as lead counsel, with Such in a subordinate role. Judge Ball emphasized that Such was not competent to represent defendant. Later, Judge Ball issued a minute order stating its intention to follow the rule that a self-represented defendant is not entitled to appointment of *Keenan* counsel. (*See Scott v. Superior Court* (1989) 212 Cal.App.3d 505, 509-512.)

At a hearing on July 23, 2009, Judge Ball reiterated that because defendant was self-represented, he was not entitled to Keenan counsel. Defendant replied that what he wanted was "advisory counsel," by which he meant something other than "standby" or *Keenan* counsel. Judge Ball told him there was no basis to appoint an advisory counsel, only standby counsel, and that he was not going to appoint Such, based on Judge Hastings's prior ruling, from which review was not taken and which Judge Ball viewed as "binding." Judge Ball explained that there were many conflict-free attorneys qualified to represent defendant if he wanted counsel, but defendant refused because he thought no local attorney wanted to handle his case. Ultimately, Judge Ball clarified with defendant that he wanted to remain self-represented "with your understanding that I cannot and will not appoint Mr. Such in any capacity as long as you're representing yourself."

On appeal, defendant contends Judge Ball was wrong to treat Judge Hastings's ruling as "binding," and presents an argument about the limitations of the "law of the case" doctrine and the ability of judges to reconsider matters based on new circumstances. We have already expressed our views on that subject, generally agreeing with defendant's legal point, though not his view of its application in this case. Judge Ball ascertained that what defendant wanted was to remain self-represented and have Such working on the case, other than as mere standby counsel. Judge Ball had said he "cannot and will not" appoint Such, meaning that he both felt bound by Judge Hastings's ruling and declined to appoint Such based on his own

19

powers. After all, he stated on the record he thought Such was not competent, based on the "ruling *and the evidence*." (Italics added.) Therefore Judge Ball *did* reconsider the matter anew, despite his comments about the binding nature of the prior ruling.

On the merits, defendant relies heavily on the Harris case in arguing Judge Ball's ruling was an abuse of discretion. We find *Harris* distinguishable. Such had not tried any homicide cases for decades, but had become an accomplished criminal appellate attorney. While that reflects a notable achievement, it did not qualify Such to try a capital case. And although the date of the document about his medical condition is uncertain, it confirmed there was a genuine concern he would need a second attorney to take over the case. Defendant's professed trust and confidence in Such weighed in favor of the motion to reinstate, but was not dispositive.

In contrast, in *Harris*, the defendants were members of the Symbionese Liberation Army, facing life without parole for kidnapping with bodily harm and related charges. (*Harris*, *supra*, 19 Cal.3d at pp. 789-790 & fn. 1.) There were two main reasons for appointing particular attorneys; the first was that the attorneys seeking appointment had already represented the defendants in related criminal proceedings and their familiarity with the issues and witnesses "would greatly facilitate their preparation for the instant case" and also provide a " 'continuity of representation' similar to that enjoyed by the prosecution in these circumstances." The second reason was that the defendants and their attorneys had, "[i]n the course of their extended relationship," shared certain "political and social perceptions" such that "a sense of mutual trust and confidence had arisen" between them. "In short, petitioners had come to regard those attorneys as true champions of their cause. To deprive them of this kind of counsel in favor of two 'strangers' in whom they had no such confidence and trust, they argued, would be to deprive them of a true representation of their interests." (*Harris*, *supra*, 19 Cal.3d at p. 793; see also *id.* at pp. 797-798 & fn. 10.)

Our Supreme Court emphasized the general rule that "An indigent defendant's preference for a particular attorney, while it is to be considered by the trial court in making an appointment [citation], is not a determinative factor requiring the appointment of that attorney--even in combination with other relevant factors such as the subject attorney's competence and availability. As we have indicated, the matter rests wholly within the sound discretion of the trial court." (*Harris*, *supra*, 19 Cal.3d at pp. 795-796, fn. omitted.) But *Harris* held that given the unique nature of the case and the extensive relationship between the proposed attorneys and the defendants, including the *trial* representation by the attorneys of the defendants and the attorneys' extensive trial experience, it was an abuse of discretion to deny their appointment. (*Id.* at pp. 793, 797-799, fn. 10.)

*Harris* is distinguishable on several key points. First, defendant, while an accused murderer, is not a member of a group like the Symbionese Liberation Army, such that few attorneys would want to be associated with him. This killing was not political. Second, Such had not represented defendant in prior *trial* matters, as had the

attorneys in *Harris*, only in appellate and ancillary habeas corpus matters. Third, unlike the attorneys in *Harris*, Such did not have any current expertise in criminal *trial* practice.

Particularly given Such's lack of current trial experience and continued concerns about his medical condition, we find no abuse of discretion by Judge Ball. (See, e.g., *People v. Sapp* (2003) 31 Cal.4th 240, 256 ["Harris acknowledges that a trial court need not appoint [an attorney with a special relationship with the defendant] when there are 'countervailing considerations of comparable weight.' [Citation.] Here, the facts . . .raised serious concerns about [the assigned public defender's] ability to competently represent defendant"]; *People v. Panah* (2005) 35 Cal.4th 395, 425 ["unlike the attorneys in *Harris*, Shafi-Nia was so wholly inexperienced in criminal matters that, even in appointing him, Judge Ito made it clear he was to function as 'second counsel' "].)

Finally, defendant contends Judge Ball was wrong in his view that he lacked discretion to appoint advisory counsel. At the first hearing, Judge Ball indicated he understood the principle of advisory counsel, by agreeing with the prosecutor's concern that appointing Such as advisory counsel would allow him to act as a "puppet master" while defendant was supposedly self-represented. At that hearing he stated he would not appoint Such in "any capacity so long as" defendant was self-represented. At the second hearing he did state at one point that "there's no such thing" as advisory counsel, only standby counsel, though he later said "I do not intend to appoint Mr. Such as advisory counsel to you."

We agree with defendant that a trial court does have discretion to appoint advisory counsel for a self-represented defendant. (*See People v. Bigelow* (1984) 37 Cal.3d 731, 742-743; see *People v. Scott*, *supra*, 212 Cal.App.3d at pp. 509-510.) Based on the entirety of the record of the two hearings, the isolated snippets that could be read to suggest Judge Ball was unaware of the discretion to appoint advisory counsel are not persuasive.

But even if Judge Ball did fail to exercise discretion, thereby abusing his discretion (see *People v. Orabuena* (2004) 116 Cal.App.4th 84, 99), we would find no prejudice for two reasons.

First, Judge Ball repeatedly and clearly stated he would never appoint Such in any capacity, and Such was the only attorney defendant wanted. Second, as Judge Lacy explained in denying defendant's new trial motion, Judge Lacy repeatedly offered defendant advisory counsel, though not Such, and defendant spurned those offers. This confirms he wanted Such and only Such, he did not want advisory counsel generally. But defendant conceded he had no right to choose advisory counsel. Therefore, Judge Lacy's offers of advisory counsel cured any arguable failure to exercise discretion by Judge Ball.

/////

/////

4. *The ruling by Judge Lacy in 2013*

Defendant contends that once the death penalty was dropped, Judge Lacy abused his discretion by denying the 2013 motion to reinstate Such.

As explained above, Judge Lacy noted, among other factors, that defendant had complained about Such's interference with the case after his removal. On appeal, defendant downplays this, by inferring that because he asked for Such in 2013, "whatever strife there was in 2011 had now been resolved." Judge Lacy was not required to draw that inference, but could well conclude defendant--and possibly Such--was playing games about counsel issues and seeking to further delay the trial. After all, Judge Lacy had concluded the concerns defendant expressed were so severe they would likely have justified a Marsden removal order. Although a penalty phase retrial would no longer be necessary, Such had not tried a murder case for many years.

We agree with the Attorney General that "as the years progressed, it became apparent that [Such's] lack of trial experience, having not tried a criminal case in over 20 years, amongst other things, was threatening not only appellant's rights, but the People's and the court's interest in orderly administration of justice and preventing substantial impairment of court proceedings." The (unchallenged) 2008 order removing Such supports the Attorney General's summation of the reason why Such had been appointed as *Harris* counsel, namely, the expectation that his knowledge of the case would *expedite* retrial or settlement of the case. This did not happen, and Such presented as inexperienced, with medical issues, an overburdened appellate caseload, and unreasonable proposed tactics. Even with the death penalty off the table, this was still a special-circumstances murder case, with four theories of liability (premeditation, burglary murder, robbery murder, and lying-in-wait), with added complexities about absent witnesses, other-crimes evidence (Cross), and forensic reconstruction testimony. Judge Lacy could well conclude Such was incapable of handling this particular retrial; indeed, any other conclusion would have been dubious.

The Attorney General points to Such's violations of the "cease and desist" order as further support for Judge Lacy's decision. In his reply brief, even defendant concedes, as he must, that Such became an "officious intermeddler." Clearly, Such was personally embroiled in the case, which further rendered him an inappropriate choice.

Accordingly, for all of the above reasons, we conclude that Judge Lacy had ample grounds to find Such unqualified to represent defendant, even after the People dropped the death penalty and thereby simplified--somewhat--the retrial in this case.

ECF No. 13-27 at 33-46. Petitioner also raised these claims in a petition for review to the

California Supreme Court (ECF No. 13-28 at 22-24) which was summarily denied (*Id.* at 1).

/////

B.  Legal Standards

1.  Choice of Counsel

The Supreme Court has stated that a defendant who requires counsel to be appointed for him has no right to choice of counsel. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006). "[T]hose who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts." *Caplin & Drysdale v. United States*, 491 U.S. 617, 624 (1989).  In *Wheat v. United States*, the Supreme Court noted that:

> [W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.

486 U.S. 153, 159 (1988).  And the Sixth Amendment right to select one's counsel is not an absolute one; it may be circumscribed where the interests of justice require. *Id.*; *see also Gonzalez-Lopez*, 548 U.S. at 152 ("We have recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness . . . .").

C.  Analysis

The court finds that plaintiff's claims related to appointment of counsel fail.  As an initial matter, this court does not review the propriety of the state appellate court's interpretation of state case law, i.e. *Harris*, *Smith*, or any of the other state cases interpreted and applied in its decision. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (federal habeas relief not available to correct errors in interpretation or application of state law).  And fundamentally, the state courts' decisions did not contravene any clearly established federal law.

With respect to the trial court's decision not to appoint attorney Richard Such, it must be emphasized that petitioner – for whom counsel was appointed rather than retained – had no right to the counsel of his choice. *Gonzalez-Lopez*, 548 U.S. at 151.  And, even if Such had been retained on petitioner's own dollar, there were compelling reasons to prevent his continued representation.  As noted *supra* in the state appellate court's decision, there were various issues with Such's continued involvement, including his availability owing to medical issues, lack of

23

experience litigating capital cases and his unprofessional behavior.[8]  ECF No. 13-14 at 144-149, ECF No. 13-17 at 24 – 28.  A defendant's choice of attorney is not an absolute right and, in this instance, the "purposes inherent in the fair, efficient and orderly administration of justice" weighed against Such's appointment.  *See United States v. Ensign,* 491 F.3d 1109, 1115 (9th Cir. 2007).  Nor is the court persuaded, as petitioner argues, that other appointable attorneys were all conflicted and it was a binary choice between Such and self-representation.  The record is precisely to the contrary.  At a July 2013 hearing, the trial judge specifically identified an appointable attorney who was neither a former district attorney nor a former public defender – ties which petitioner believed raised conflicts.  ECF No. 13-17 at 28.  The judge asked petitioner if he would like the identified attorney to be appointed and petitioner said no.  *Id.*  Finally, the trial court's alleged misinterpretation of petitioner's request for advisory counsel did not violate his rights because there is no established right to the same.  *See Locks v. Sumner*, 703 F.2d 403, 407-408 (9th Cir. 1983) ("If the right to co-counsel is not of constitutional dimension, we fail to see why the right to advisory counsel should be afforded higher status.") (internal citation omitted).

Petitioner's claims concerning his decision not to attend his trial must also be rejected. First, he claims that, owing to the trial court's decision not to appoint Such or stand-by counsel, his decision to absent him from trial resulted in a total lack of representation.  Second, he argues that the trial court erred when it permitted him to absent himself without the court first obtaining a waiver in writing.  These claims were presented to the state courts by way of a habeas petition filed with the California Supreme Court.  ECF No. 13-29 at 41-53.  The Supreme Court summarily denied the petition in its entirety.  *Id.* at 1.

/////

/////

/////

---

[8] The trial court noted that petitioner himself – after dismissing counsel and proceeding *pro per* - had previously accused Such of "interfering" in the case and sought a court order directing him to desist.  ECF No. 13-17 at 25-26.

The Supreme Court has not addressed "whether and under what conditions a defendant who validly waives his right to counsel has a Sixth Amendment right to reassert it later in the same stage of his criminal trial." *John-Charles v. California*, 646 F.3d 1243, 1249 (9th Cir. 2011).

The lack of any Supreme Court precedent speaking to the re-assertion of a right to counsel in the same criminal trial precludes habeas relief on petitioner's first claim. Petitioner's claim related to the lack of written waiver sounds in state law[9] and, thus, also offers no ground for federal relief. He cannot convert it into a federal claim merely by alleging a violation of his due process rights. *See Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996) ("Langford may not, however, transform a state-law issue into a federal one merely by asserting a violation of due process.").

## II.   Ineffective Assistance of Appellate Counsel

Next, petitioner alleges that his counsel on direct appeal rendered ineffective assistance by failing to: (1) perfect the record on appeal; (2) read the complete record on appeal; (3) accept the assistance of former appellate and trial counsel in improving the appeal; (4) use evidence in the record that showed that the killing was manslaughter rather than murder; (5) move to expand appointment to file an ancillary habeas writ; and (6) file an ancillary habeas writ that showed that petitioner had a "compelling defense" to the murder and burglary charges he was convicted of.

### A.   State Court Decision

Petitioner raised these claims in a habeas petition filed with the California Supreme Court. ECF No. 13-29 at 5. That petition was summarily denied. *Id.* at 1.

/////

/////

/////

---

[9] Petitioner offers little context for this claim in his federal petition. The petition filed with the California Supreme Court, however, makes clear that the claim is grounded in state law. *See* ECF No. 13-29 at 49 ("Mr. Hayes was deprived of [the right to be present at trial] when he was allowed to absent himself from trial without a waiver of the right which met the requirements of California Statutes.").

25

B.     Legal Standards

Under the Supreme Court's decision in *Strickland v. Washington*, a petitioner alleging ineffective assistance of counsel must show that: (1) his counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense.  466 U.S. 668, 687 (1984).

C.     Analysis

Petitioner's ineffective assistance of appellate counsel claims fail because he has not established that any of counsel's omissions prejudiced him.  He has not offered any evidence that he would have obtained a different appellate outcome if his counsel had perfected the record on appeal, read the complete record, or sought assistance from former counsel. *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").  Similarly, he offers no evidence that an argument predicated on the killing being manslaughter instead of murder would have succeeded.  Finally, his claims regarding appellate counsel's failure to file a habeas petition have no basis in established federal law.  Petitioner argues that the Supreme Court's decision in *Martinez v. Ryan* compelled his appellate counsel to assist him in filing a habeas petition. 566 U.S. 1 (2012).  It does not.  In *Martinez*, the Supreme Court held only that ineffective assistance in an initial-review collateral proceeding could excuse a procedural default in a federal habeas proceeding. *Id.* at 9. *Martinez* did not address the question of whether a prisoner has a right to effective counsel in collateral proceedings which provide the first opportunity to raise a claim of ineffective assistance of trial counsel. *Id.* at 8-9 (holding that *Martinez* was not the appropriate case to resolve that question).

III.    Right to Due Process and to Cross-Examine Witnesses

Petitioner claims that his due process rights were violated when the trial court instructed the jury not to consider the reasons for the lengthy delay in the trial.  He also contends that his right to cross-examine was violated when the prosecution elicited testimony from Michele Gebert as to what Andrew James told her.  James was deceased by the time of petitioner's second state trial and, thus, he could not be cross-examined or his credibility impeached.

/////

26

A.    State Court Decision

The state court of appeal rejected these claims on direct review:

> Defendant next argues the trial court should have permitted introduction of evidence of prosecutorial misconduct at the first trial, and improperly instructed the jury that prior testimony of witnesses came from a "hearing" rather than a prior trial. We disagree with these partly related claims.

> **A. Evidence of Purported Prior Misconduct**

> James died before the retrial, and he was one of a number of witnesses the trial court ruled were unavailable and whose prior testimony could be admitted. However, his testimony was not introduced, accordingly, evidence about his purported inducements to testify at the first trial were excluded. Defendant contends this was error. We do not agree.

> Before trial, the trial court ruled that if the prosecutor introduced James's prior testimony, it would instruct the jury that there had been a deal about pending charges reached between James's attorney and the prosecutor at the time, and this information was withheld both from James and from defendant's former attorney, who therefore had had no opportunity to cross-examine James about it. Defendant considered proposing an instruction on the point but did not do so. Later, the trial court directed defendant not to raise any issues before the jury about the Ninth Circuit's decision (i.e., *Hayes II*). Defendant strongly protested this ruling, and then chose to absent himself from the trial.

> As the trial court stated before trial: "[T]he fact that a Deputy District Attorney may have lied to the court 30 some years ago has no relevance with regard to the facts as to what occurred on January 1st [i.e., the date of the killing], other than as it would relate to former testimony of Mr. James." And when denying defendant's new trial motion, the trial court emphasized: "The prosecutor's misconduct . . . related to the testimony of only one witness, Andrew James. Eliminating the testimony (read-back of former testimony) of Mr. James made the prosecutor's misconduct immaterial to [defendant's] guilt or innocence. [Defendant] merely speculates that Michelle Gebert knew of the promise made to Mr. James['s] attorney. Speculation is not a basis upon which to grant a new trial."

> We agree with the trial court. Only relevant evidence is admissible. (Evid. Code, § 350.) Evidence is relevant if and only if it has a tendency in reason to prove or disprove a material disputed fact. (*Id.*, § 210.) Once it was determined that James's testimony would not be introduced, whatever the former prosecutor did or did not do at the first trial was irrelevant and inadmissible because it would be of no help to this jury in performing its task of determining what defendant did or did not do on January 1, 1980.

> Defendant speculates that Gebert knew about the deal because she and James were in a relationship, and she had a motive to be a

27

prosecution witness to reduce the chances James would be prosecuted. But speculation is not evidence; there is no evidence that Gebert knew anything about James's "deal"; indeed, given that James did not know about it at the time of the first trial, it is difficult to imagine how Gebert--who did not testify at the retrial, but whose testimony from the first trial was read into the record--could have known about it at the time of the first trial.

Defendant also speculates that the entire "prosecution team" was tainted, but there is no *evidence* supporting his claim that the prosecutor who retried the case, or Detective Wingo, or the pathologist, or any other prosecution witness, was involved in the alleged prosecutorial misconduct. In short, the *Hayes II* opinion arose from a particular set of facts adduced at the hearing in federal court, and did not implicate the truth or falsity of the issues the jury was asked to decide on retrial. It was irrelevant to the retrial and properly excluded.

**B. Instructions on a Prior "Hearing"**

After the prosecutor completed his argument, the trial court read "Special Instruction #4" to the jury as follows:

"[T]here has been a prior hearing in this matter, what happened or didn't happen at that prior hearing is not relevant and you are not to speculate as to what might have happened at the prior hearing. This trial is a hearing which involves facts that happened in 1980, and at a prior hearing there were some witnesses who testified and those witnesses are no longer available and you have heard their testimony through their recorded transcripts. But again, you are not to speculate as to what might have been the nature of the hearing, what might have happened as a result of the hearing, none of that is relevant to any issue you have to decide in this case."

Later, the trial court instructed the jury (CALJIC No. 2.12) that "[t]estimony given by a witness at a prior proceeding who was unavailable at this trial has been read to you from the reporter's transcript of that proceeding. You must consider that testimony as if it had been given before you in this trial." The court also instructed on witness credibility, CALJIC No. 2.20.

/////
/////
/////
/////
/////
/////
/////

1
2
3
4
5
6

There is no record that defendant objected to this instruction. Nor do we see in what manner it was inaccurate or deficient on its face, given our conclusion that the trial court correctly ruled that the reasons for the reversal and retrial were not relevant.[10] Although before his second trial defendant made clear that he wanted the new jury to learn a prior judgment had been vacated because of misconduct, and that he was not responsible for the delay in the case, those facts were not relevant to any issue the new jury was asked to decide. Although defendant protests the lack of "context" on appeal, as we have explained, the context of James's undisclosed deal was not relevant given that the second jury never heard his testimony.

7
8
9
10
11

Finally, defendant points out that Gebert had been a prosecution witness, and argues the fact the second jury did not learn this would or likely would have caused the jurors to view her testimony differently. The second jury was read the transcript of her testimony, which began: "Michelle Gebert, *a witness called on behalf of the People*, having been duly and regularly sworn, testified as follows." (Italics added.) Therefore, the jurors on retrial knew she was a prosecution witness.

12

We find no error in instructing the jury that a prior "hearing" took place.

13
14

ECF No. 13-27 at 27-30.  Petitioner also raised these claims in a petition for review to the California Supreme Court (ECF No. 13-28 at 16-19) which was summarily denied (*Id.* at 1).

15

B.    Legal Standards

16

i.    Confrontation Clause

17
18
19
20
21
22

The Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant . . . had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).  A Confrontation Clause violation is harmless unless a petitioner can demonstrate that it had a substantial and injurious effect or influence in determining the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).

23

ii.    Exclusion of Evidence

24
25
26

A state court's allegedly erroneous exclusion of evidence does not violate a petitioner's due process rights unless the exclusion denies him the right to a fair trial. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also Alcala v. Woodford*, 334 F.3d 862, 884 (9th Cir. 2003) ("Even if

27
28

[10] **[Footnote 10 in original text]** One stray reference to a prior "trial" inadvertently occurred, to which no objection was interposed.

29

1   the trial court erroneously excluded Fallen, Crawford, and Vasquez as a matter of state law, we

2   cannot afford him habeas relief unless the exclusion violated his due process right to a fair trial.").

3                    C.        Analysis

4        Both claims fail.  At the very least, fair-minded jurists could disagree a to the state court's

5   conclusion that the prosecution's misconduct *vis a vis* prior witness Andrew James, who was

6   deceased and not testifying at the new trial, was irrelevant to the fundamental question of

7   petitioner's guilt or innocence.  *See Harrington v. Richter*, 562 U.S. 86, 101 (2011) ("A state

8   court's determination that a claim lacks merit precludes federal habeas relief so long as

9   'fairminded jurists could disagree' on the correctness of the state court's decision.").  Thus, the

10  jury's failure to consider the reason for the delay in trial does not militate in favor of granting

11  habeas relief.

12       The same holds true for petitioner's claim that he was unable to cross-examine James and

13  impeach his credibility or to adequately explore Michelle Gebert's potential bias and motive for

14  testifying as a prosecution witness.  James' testimony was, as noted by the state court, not

15  invoked at the second trial.  And the state court reasonably concluded that petitioner's assertions

16  as to Gebert's motives testifying were speculative.  In his current petition, he argues that, had

17  evidence been presented that Gebert knew about James' deal with the prosecution in the first

18  case, the jury would have "realized that when Gebert testified at the first trial, she had a motive to

19  conform her testimony to James's testimony and to the People's theory of the case so that her

20  boyfriend would receive the benefit of his bargain."  ECF No. 18 at 79.  But, he has offered no

21  evidence that Gebert actually knew about the deal or, indeed, done anything to rebut the state

22  court's conclusion that it was unlikely she had any knowledge of it.  *See* ECF No. 13-27 at 29

23  ("[T]here is no evidence that Gebert knew anything about James's 'deal'; indeed, given that

24  James did not know about it at the time of the first trial, it is difficult to imagine how Gebert--who

25  did not testify at the retrial, but whose testimony from the first trial was read into the record--

26  could have known about it at the time of the first trial.").

27  /////

28  /////

30

1      Finally, the court necessarily rejects any claim, to the extent petitioner seeks to raise one,

2   that hearsay statements were admitted in contravention of California state law.  *See Estelle*, 502

3   U.S. at 67 ("We have stated many times that federal habeas corpus relief does not lie for errors of

4   state law.") (internal quotation marks omitted).

5      IV.   Instructional Error

6      Petitioner's final claims concern instructional error.  He argues that the trial court erred in

7   failing to instruct the jury that, as to felony murder, the intent to commit the felony must be

8   formed before or at the time of the killing.  He also contends that the trial court erred in failing to

9   instruct the jury as to his right not to testify.

10      A.   State Court Decision

11      Petitioner raised these claims in a petition for review before the California Supreme Court.

12   ECF No. 13-28 at 12-16.  That petition was summarily denied.  *Id.* at 1.

13      B.   Legal Standards

14      Federal habeas relief for state law instructional error will lie only where "the ailing

15   instruction by itself so infected the entire trial that the resulting conviction violates due process."

16   *Estelle*, 502 U.S. at 72.

17      C.   Analysis

18      These claims fail because they sound entirely in state law and petitioner has made no

19   showing that the instructional error rendered his trial unfair.  With respect to the felony murder

20   instruction, petitioner argues that:

21          Because CALJIC No. 8.21 did not clearly require a concurrence
            between the fatal act and the specific intent to commit the underlying
22          felony, there is a reasonable likelihood that jurors would look back
            to CALJIC No. 3.31 and conclude that because felony murder was
23          deliberately omitted from the rule requiring a concurrence of act and
            specific intent, it was unnecessary to determine whether appellant
24          had the specific intent to commit burglary at the time of the fatal act.

25   ECF No. 18 at 88.  Petitioner cites no evidence from the actual trial record to support this

26   assertion.  Moreover, the jury was instructed that:

27          The unlawful killing of a human being, whether intentional,
            unintentional, or accidental, which occurs as a result of the
28          commission of the crimes of robbery or burglary and where there was

31

in the mind of the perpetrator the specific intent to commit such crime, is murder of the first-degree.

The specific intent to commit the robbery and/or burglary and the commission of such crimes must be proved beyond a reasonable doubt.

ECF No. 13-20 at 182-183.  As respondent points out, finding that a killing occurs "as a result of" a robbery or burglary necessitates a finding that the intent to rob or burgle existed at the time of the killing.  At the very least, a fair-minded jurist could review these instructions and conclude that, in the absence of clear evidence to the contrary, the jury understood them to require as much.

With respect to instructions as to petitioner's right not to testify, the trial court instructed the jury that:

A defendant in a criminal case, whether he or she is represented by an attorney or represent themselves, don't have to do anything; they can sit there, listen to the Prosecution's case, and when it's all done get up and say, ladies and gentlemen, the D.A. hasn't proven it, find my client, or find me not guilty.

ECF No. 13-18 at 97.  Juries are, absent some evidence to the contrary, presumed to follow their instructions.  *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).  And a fair-minded jurist could conclude that this instruction was sufficient to protect petitioner's constitutional rights.

## CONCLUSION

For all the reasons explained above, the state courts' denial of petitioner's claims was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).  Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  *See* 28 U.S.C. § 2253(c)(2).  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file

1   objections within the specified time may waive the right to appeal the District Court's order.

2   *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

3   Dated: February 7, 2022.

4

5                                                    EDMUND F. BRENNAN
                                                     UNITED STATES MAGISTRATE JUDGE
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28